IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> v. </br></br> APPROXIMATELY $1,199,530 IN UNITED STATES CURRENCY SEIZED FROM THE APARTMENT OF ANTWAIN FREEMAN IN NORTH BERGEN, NEW JERSEY, ON OR ABOUT AUGUST 17, 2021 | **Civil No. 3:23-CV-781** |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney, in a civil cause of forfeiture, and respectfully states the following:

**I. INTRODUCTION**

1. This is a civil action *in rem* against approximately $1,199,530 in United States Currency seized from the apartment of Antwain Freeman ("Freeman") in North Bergen, New Jersey on or about August 17, 2021 (hereafter, "the Currency"). The Currency was involved in an unlicensed money transmitting business ("MTB") involving Chinese money couriers, Charlotte-area businessman James Whitner, Jr. ("Whitner"), Freeman, and others. Although the purported purpose of Whitner's involvement in the unlicensed MTB was to obtain payment for shoes and apparel—including shoes and apparel produced by an Oregon-based manufacturer that one of Whitner's businesses improperly resold to the Chinese seller—in actuality, the unlicensed MTB involved a complex web of Chinese and American individuals, some of whom have been criminally charged, and facilitated the movement of millions of dollars in crime proceeds. The Currency was involved in that unlicensed MTB and in conduct that evaded vital laws designed to prevent bad actors from using the United States financial system to launder crime proceeds.

1

2. Specifically, and as set forth more fully below, for multiple years, the individuals and businesses set forth herein coordinated for a trade-based money laundering network of individuals in and with ties to China and the New York City area to facilitate the movement or transfer of millions of dollars in United States Currency ("USC"), at least some of which was derived from illegal activity, for the benefit of Whitner and his businesses. Whitner, Freeman, and others coordinated for this movement of money despite the fact that none of the individuals involved were properly licensed or registered as money transmitting businesses and despite the fact that their activity resulted in transactions that were not properly reported under the Bank Secrecy Act.

3. The network of Chinese nationals known and unknown to investigators in this case bears the hallmarks of a Chinese Money Laundering Organization (MLO). Since at least 2016, Chinese MLOs have grown in popularity in the United States. This popularity is attributable, in part, to the fact that the Peoples' Republic of China implemented a law restricting the amount of money that could be transferred out of China, causing Chinese nationals to resort to the black market to circumvent the law and acquire access to their money in the United States.

4. In this case, the Chinese MLO and others identified herein engaged in a form of "mirror exchanges" and, as noted above, "trade-based money laundering." Specifically, in order to execute transactions, Chinese MLOs sell USC collected from illicit activities in, among other places, the United States, to Chinese customers who want to spend money in the United States. To make the exchange, the MLO directs the Chinese customer to transfer or deposit the equivalent amount of Chinese RMB (the official currency of the People's Republic of China), plus commission, into an MLO-controlled bank account in China. Then, the Chinese customer is given an equivalent amount in USC, which is available for expenditure in the United States. This

mechanism of money transfer is commonly referred to as a "mirror exchange." In some instances, as in this case, the mirror exchange is executed so that USC derived from illicit activity can be used in various money laundering schemes, such as the purchase of retail goods, also known as "trade-based money laundering."

5. In this case, the business was conducted under the auspices of an individual in China purchasing apparel from Whitner—apparel that, per the manufacturer, Whitner was not allowed to resell at all or resell out of country—for resale in China, to others in the United States, and elsewhere. The Chinese purchaser paid a Chinese Broker for the apparel. Then, the Chinese money couriers identified below, working at the direction of the broker in China, collected money from, among others, individuals engaged in illegal activity. Specifically, these Chinese money couriers have told investigators that they were directed to collect and assemble large amounts of USC from Chinese women who they understood to travel frequently across the United States and who they believed to be involved in prostitution. And, at least one money courier has advised that the courier fronted USC to Freeman and then obtained recompense from narcotics proceeds. Although the business was conducted under the auspices of trade in apparel, in reality, the Money Transmitting Business ("MTB") collected and moved cash from illegal activity, which Freeman and then Whitner ultimately introduced into the banking system. Throughout the course of collecting, transferring, and delivering the money to Freeman, who then facilitated the pickup and deposit of the USC via armored security companies and to bank accounts controlled by Whitner and his businesses, the Chinese money couriers, Freeman, and Whitner failed to properly file reports, caused others to fail to properly file reports, or caused others to file erroneous reports, such as Form 8300s and Currency Transaction Reports (CTR), required by the Bank Secrecy Act. Further, during the course of this conduct, none of the individuals or entities involved in the money

movement properly obtained licensure or registered as a MTB with state or federal authorities.

6. Thus, the Currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because the Currency constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960 (prohibition of unlicensed money transmitting businesses) or any property traceable to such property. The Currency is also subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2) and 18 U.S.C. § 981(a)(1)(A) because it was involved in a violation or conspiracy to violate 31 U.S.C. § 5324(b)(1) (causing a nonfinancial trade or business to fail to file a report under Section 5331) and/or 31 U.S.C. § 5324(a)(2) (causing or attempting to cause a financial institution to file a report that contains a material omission or misstatement of fact).

## II. NATURE OF THE ACTION

7. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. §§ 981 and 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

8. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

9. Venue is proper pursuant to 28 U.S.C. § 1395 because the forfeiture claim for the Currency accrued in the Western District of North Carolina.

10. Based on the following facts, verified by Internal Revenue Service-Criminal Investigation Special Agent Rajender J. West, this action seeks the forfeiture of all right, title, and

interest in the Currency.

## III. MONEY TRANSMITTING AND BANK SECRECY ACT LAW

### A. The Unlicensed Money Transmitting Business Statute

11. Title 18 U.S.C. § 1960(b)(1) defines an "unlicensed money transmitting business" and prohibits any such business that affects interstate or foreign commerce in any manner or degree and is operated without a State license; is not registered with the federal government as required under Section 5330 of Title 31, United States Code, or regulations prescribed under such section; or otherwise involves the transportation or transmission of funds that are known to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity. Section 1960(b)(2) indicates that the term "money transmitting" includes transferring funds on behalf of the public by any and all means.

12. Title 18 U.S.C. § 981(a)(1)(A) renders any property involved in a transaction or attempted transaction in violation of Section 1960 subject to forfeiture.

### B. The Bank Secrecy Act

13. The purpose of the Bank Secrecy Act is to (1) require certain reports that are highly useful in criminal and other investigations; (2) prevent the laundering of money and the financing of terrorism; (3) facilitate the tracking of money sourced through crime or intended to promote crime; (4) assess the money laundering and other risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard national security; and (5) establish appropriate frameworks for information sharing among financial institutions, regulators, law enforcement, and others so as to identify, stop, and apprehend money launderers and those who finance terrorists. 31 U.S.C. § 5311.

14. To effectuate this purpose, the Bank Secrecy Act requires the reporting of certain financial transactions. For example, the Bank Secrecy Act requires a trade or business to file a report on any currency receipt of more than $10,000. Such a report is often called an Internal Revenue Service or Financial Crimes Enforcement Network Form 8300 (hereafter, "Form 8300"). Further, the Bank Secrecy Act requires financial institutions to file Currency Transaction Reports (CTRs) on each deposit, withdrawal, exchange of currency, or other payment in currency of more than $10,000 by, through, or to such financial institution. The reports required by the Bank Secrecy Act typically identify the parties to, amounts of, and dates of transactions. Title 31, United States Code, forbids persons from causing financial institutions and nonfinancial trades or businesses to (1) fail to file require reports or (2) file reports that contain material omissions or misstatements of fact.

15. Title 31 U.S.C. § 5317(c)(2) renders any property involved in a violation of the BSA statutes noted herein or conspiracy to commit same subject to forfeiture, and Title 18 U.S.C. § 981(a)(1)(A) renders any property involved in a transaction or attempted transaction in violation of the BSA statutes noted herein subject to forfeiture.

## IV. THE INDIVIDUALS AND ENTITIES

### A. James Whitner and His Businesses

16. At the times pertinent herein, James Regis Whitner, Jr. ("Whitner") was the sole owner and authorized agent of Jaizai Investments, Inc., Trois Investments, Inc., and Flava Factory, Inc., doing business as The Whitaker Group (collectively "Whitner's businesses" or "the Whitaker Group"). The Whitaker Group was a nonfinancial business located in Charlotte, North Carolina, within the Western District of North Carolina. The Whitaker Group was the umbrella entity that

owned the retail brands, Social Status, APB, and A Ma Maniére, among others.

17. The Whitaker Group's retail locations, operated throughout the United States, were high-end boutique clothing stores recognized internationally for the merchandise that they sold. The stores specialized in rare, limited edition, athletic shoes and apparel.

18. As discussed more fully below, Whitner's business, Jaizai Investments ("Jaizai") previously maintained one or more accounts at PNC Bank, and later maintained one or more accounts at South State Bank, while continuing to maintain accounts at PNC Bank. Whitner and his employees communicated with bankers about the business of Jaizai and the Whitaker Group businesses. Further, the Whitaker Group employed one or more accountants and also engaged the service of one or more certified public accounting firms.

19. An individual identified herein as "JH" was an Operations Manager for Jaizai Investments. JH assisted Whitner with his businesses and financial transactions, including the movement of money involving Freeman, as noted below.

20. Whitner and his businesses had contractual relationships with several sneaker companies. In contracts with at least one of the sneaker companies based in Oregon (hereafter, "Sneaker Company"), Sneaker Company expressly forbode Whitner and Whitner's businesses from selling, shipping, consigning or otherwise transferring Sneaker Company's sneakers and other apparel: 1) outside the United States; 2) to another retailer, or to a distributor or broker; or 3) to any other person under circumstances where Whitner knew or should have known based on the circumstances of the transaction that the product was intended for resale or would likely be resold. However, as noted below, as part of his involvement in an unlicensed MTB, Whitner did, in fact, sell sneakers and other apparel to other retailers and, in particular, to a Chinese retailer outside of the United States. Whitner and his businesses used code-names, such as "Nevada" and

"Kansas," to refer to these retailers. Such code names were particularly used amongst warehouse employees who, in some instances, were unaware of the nature of Whitner's business selling goods to other retailers.

21. Whitner and his businesses were not licensed or registered as MTBs with any state or with the federal government.

**B. YG**

22. An individual identified herein as "YG" was a Chinese national who distributed and/or sold sneakers and apparel in Asia and elsewhere. Since at least 2016, YG had a long-standing business relationship with Whitner and his businesses. YG was sometimes identified by the moniker, "Nevada," in Whitaker Group records. YG also knew the "Broker" discussed below.

23. As detailed below, YG both delivered large amounts of currency directly to Whitner in Charlotte, North Carolina, and used the Chinese MLO and the unlicensed MTB to deliver currency, including the Currency subject to forfeiture herein, to Whitner and/or others operating the unlicensed MTB. In neither of those circumstances did anyone properly file accurate Bank Secrecy Act documents on the transactions.

**C. The Money Couriers and Broker**

24. At the times pertinent herein, multiple Chinese individuals, identified herein as "the Money Couriers," operated in and around the New York City area. The Money Couriers were tied to both the Chinese community living in the New York City area and to individuals living in China. At least one Money Courier delivered some of the USC discussed below to Freeman's home in New Jersey, and at least two Money Couriers delivered some of the USC discussed below to Freeman's business, identified below as "the Foundation," in Midtown Manhattan.

25. Further, an individual identified herein as "the Broker" was based in China and

regularly provided direction to the Money Couriers on where to go in New York City to collect money to finalize transactions requested by individuals in China to be effectuated in the United States. In instances in which the Money Couriers lost money or failed in their duties, the Broker would also compensate Chinese money service customers and then collect recompense from the Money Couriers.

26. The Broker and Money Couriers were not licensed or registered as a MTB with any state or with the federal government. The Broker and the Money Couriers engaged in transactions related to Whitner, Freeman, YG, and the seized Currency.

**D. Freeman and The Foundation**

27. At the times pertinent herein, Freeman, also known as "Hutch," was a resident of North Bergen, New Jersey. As set forth below, Freeman was a close friend of Whitner. Freeman was not licensed or registered as a MTB with any state or with the federal government.

28. The Foundation was a brand development corporation located in Manhattan, NY and operated by Freeman. The Foundation was not a retail location for The Whitaker Group's businesses, sneaker sales, or apparel sales. Nonetheless, Whitner and an associate told PNC Bank and Brinks that the Foundation was a subsidiary of Jaizai, and a location where retail business was conducted. For example, The Foundation was referred to as "Store 18" in at least one communication to Brinks.

29. Whitner, Freeman, the Foundation and others coordinated for the movement of cash, including the Currency, and receipt of said USC by Freeman. Further, since Whitner and an associate falsely told PNC Bank and Brinks that the Foundation was a retail location and subsidiary of Jaizai, these false statements caused financial institutions to, file false Currency Transaction Reports when Whitner, Freeman, Jaizai, and/or the Foundation deposited USC,. Whitner also

9

Case 3:23-cv-00781-MOC-DCK    Document 1    Filed 11/17/23    Page 9 of 20

misrepresented the nature of these transactions to accountants for the Whitaker Group.

V.  THE UNLICENSED MTB AND THE BSA VIOLATIONS

A. The 2016 to 2019 Transactions at Financial Institutions in Charlotte

30. Beginning no later than 2016, and despite Whitner's agreement with Sneaker Company not to sell Sneaker Company's products 1) outside the United States; 2) to another retailer, or to a distributor or broker; or 3) to any other person under circumstances where Whitner knew or should have known based on the circumstances of the transaction that the product was intended for resale or would likely be resold, Whitner sold millions of dollars of Sneaker Company's products to YG. YG resold the products in China and elsewhere. YG paid for his purchases via USC.

31. Initially, YG picked up the inventory in Charlotte, North Carolina and paid Whitner or his businesses with the USC directly, in the Western District of North Carolina. After receipt of the USC, Whitner deposited some of the USC into Jaizai Investments' and Trois Investments' PNC and later South State Bank accounts. Whitner and his businesses deposited cash in the Charlotte area over the 2012 through 2019 time-period. From at least 2017 through 2019, Whitner received large amounts of this cash as a result of Whitner's dealings with YG. However, during the same time-period, some cash was deposited in other locations outside of Charlotte, including North Bergen, New Jersey. Cash deposits totaled millions of dollars.

32. A large amount of the deposits were conducted in business accounts controlled by Whitner at PNC Bank. When PNC questioned Whitner about the source of the cash, he advised that the money was collected from cash sales of sneakers and apparel at his stores throughout the country or from special promotional events, after the cash was consolidated from store vaults to

be centralized for deposit in Charlotte, NC, and/or that the cash was derived from liquidation to resellers unfamiliar to Whitner and to whom Whitner did not want to provide his account information for purposes of electronic payment. After questioning by PNC, Whitner began shifting his businesses' banking activity to South State Bank.

33. Beginning in or about at least late 2017, Whitner arranged for YG's payment of USC for his purchases to also be made to Freeman. Whitner directed YG to deliver the cash to Freeman, either at Freeman's residence in New Jersey or at the Foundation's business location in mid-town Manhattan. As detailed more fully below, YG used Chinese money couriers who coordinated with Freeman to deliver the USC to Freeman. As noted below and reflected in phone calls and meetings between Whitner and his associates, Whitner was notified when the cash was delivered, the amount of the cash received, what person delivered the cash, and what person received the cash. Whitner maintained a spreadsheet of these cash deliveries and the related information.

34. Statements about the USC to the financial institutions resulted in CTRs that did not accurately indicate the source of the deposits as a massive influx of money from an unlicensed and unregistered MTB moving illegal crime proceeds and/or money derived from trade-based money laundering.

**B. The 2019 to 2022 MTB Involving Whitner and Individuals in New York, and the violations of the Bank Secrecy Act**

35. In approximately November 2019, Whitner ceased his cash deposit operations in Charlotte and enlisted the help of Freeman in the New York City/New Jersey area to receive the payments and facilitate subsequent deposits. Freeman, in-turn, worked with money couriers, including the Money Couriers previously identified herein and based in New York, to receive and store cash. Then, Whitner and Freeman facilitated the pickup and deposit of bulk amounts of USC

by an armored car service, that were subsequently deposited to benefit accounts held by Whitner's business, Jaizai Investments, at PNC Bank.

36. Whitner, Freeman, and others typically moved money as follows, mixing transactions in goods, such as sneakers, with money derived from illicit activity, such as illegal prostitution. Whitner, Freeman, and others moved this money without any legally required licenses or registrations to transmit money, all the while failing to file appropriate Form 8300 documents, and lying to one or more banks about the relationships of Whitner and Freeman's entities and the transactions, thus causing the banks to file false BSA documents.

   a. YG would agree with Whitner to purchase in-demand and exclusive shoes and apparel to which Whitner had access through retail contracts in the United States, which prohibited Whitner from re-selling the merchandise. Then, the MTB involving Whitner, Freeman, the Money Couriers, the Broker, and others would go to work.

   b. The Broker would receive payment from YG in China for the items that YG had requested from Whitner.

   c. The Broker would direct the Money Couriers to collect bulk USC from various individuals in the New York City area. According to at least one of the Money Couriers, the individuals from whom the Money Couriers collected money were often prostitutes or engaged in other illegal activity. The Money Couriers would collect the money, for a fee, and, once they had accumulated a certain amount of money (often $50,000 to $100,000), they would deliver the money to Freeman in New Jersey or New York City. The money was sometimes packaged in United States Postal Service flat rate mailing boxes. Images of a USPS mailing box and

currency (not the subject *res* in this case) seized from one of the couriers in 2022 are as follows:

  

Further, in some instances, one Money Courier would front money to Freeman and then obtain recompense from a narcotics trafficker. Specifically, at least one money courier has advised that YG wired money to a Chinese broker for shoes. Thereafter, the broker wired money to an account controlled by the courier's relative in the United States—an account that was used to facilitate narcotics transactions. At that point, the courier fronted USC to Freeman and then the courier reimbursed him/herself via the account that facilitated narcotics transactions

d. In and around the time that Freeman would be paid, Whitner would tell Freeman that money would be coming from Asian individuals in the New York area to Freeman; Freeman would then receive the money and, at the direction of Whitner, store the money; and Whitner or an associate would regularly follow-up with Freeman to account for the money. Freeman stored the money in USPS mailing boxes in a closet in his apartment. Freeman's storage of the money in USPS mailing boxes was consistent with the transport of the money in USPS mailing boxes by the Money Couriers. Images of the boxes in which the Currency was

located in Freeman's closet and of the Currency itself are as follows:

 

e. Earlier during the operation of the MTB, Whitner would visit Freeman in the New York City area and then transport the currency back to Charlotte. However, in December 2019, Freeman began to coordinate with Brinks, with whom Whitner had contracted for the pickup services. Brinks then transferred the cash to a second armored security company to process the deposit of cash into the Jaizai PNC Account. At least some of the pickups occurred at the business location for Freeman's business, the Foundation. Whitner, Freeman, and JH regularly discussed the cash and the deposits, and Whitner also coordinated with JH about how to communicate with Freeman about the deposits and to ensure that accounts into which Freeman deposited money were not flagged for monitoring by financial institutions. For example, in November 2021, Freeman and Whitner met and discussed, among other topics, the regular deposits of cash. In addition, in July 2022, Whitner telephonically discussed with Freeman and with another individual, multiple topics, including the boxes delivered by the Money Couriers, the amount being held for deposit as well as the amounts of specific deposits and speed of deposits, what YG had told Whitner about the deposits and whether YG trusted the

14

Case 3:23-cv-00781-MOC-DCK   Document 1   Filed 11/17/23   Page 14 of 20

people moving money, the Excel spreadsheet used to track the amount collected and deposited, and whether someone should open the boxes to double-check whether they contained appropriate amounts of deposits.

    f. Whitner did not file Form 8300 documents on these transactions whereby Freeman received money on behalf of Whitner or his businesses, nor did Whitner file Form 8300 documents when currency was later picked up by Brinks and then deposited into accounts controlled by Whitner and his businesses, nor did Whitner file Form 8300 documents after the deposits, nor did Whitner make the in-house or outside accountants for Whitner's businesses aware of the true source of the deposits. Further, because Whitner had lied to the financial institutions about the relationship between the Foundation and Jaizai, and omitted the origins of who was providing the USC, when these transactions were conducted, the banks filed BSA reports that contained material omissions or misstatements of fact.

37. By conducting business in this manner, Whitner, Freeman, and others were able to profit from transactions that were disallowed by the contract with the Oregon-based Sneaker Company, but did so at the expense of (1) properly reporting information required by the Bank Secrecy Act and (2) conducting, or, at the very least, profiting from a MTB that engaged in mirror transactions and trade-based money laundering, and that concealed criminal proceeds. Further, Whitner, Freeman, the Money Couriers, and Broker, and others did all of this without obtaining proper licensure or properly registering as a MTB as required by law.

### C. The Total Value of BSA Violations to-Date

38. Between in or about November 2017, and in or about April 2022, on at least 255 occasions, including during operation of the MTB involving the Currency, Whitner, Jaizai

15

Case 3:23-cv-00781-MOC-DCK   Document 1   Filed 11/17/23   Page 15 of 20

Investments, Trois Investments, and others received, and caused to be received, cash from YG, each transaction involving more than $10,000, thereby requiring the filing of a Form 8300. These transactions, in aggregate, totaled more than $32 million.

39. A subsequent review of Financial Crimes Enforcement Network (FinCEN) records confirmed that neither Whitner, Jaizai Investments, nor Trois Investments had ever filed a Form 8300 for any cash transaction exceeding $10,000, as required by Title 31, United States Code, Section 5331(a)(1) and 31 C.F.R. § 1010.330.

40. Between June 2016 and July 2022, including during operation of the MTB involving the Currency, Whitner, Jaizai Investments, Trois Investments, and others made, and caused to be made, over 160 deposits into the Jaizai Investments and Trois Investments bank accounts at South State Bank and PNC. Each of those deposits consisted of over $10,000 in U.S. Currency, and in aggregate totaled more than $23.5 million.

41. Whitner, Jaizai Investments, and Trois Investments provided false information to South State Bank and PNC in connection with these cash deposits which caused false entries to be made in the books, reports and statements of South State Bank and PNC, including causing the filing of false CTRs by South State Bank and PNC.

**D. The Arrest of Freeman and Seizure of the Currency**

42. In August of 2021, law enforcement arrested Freeman. At the time of his arrest, Freeman was walking to his office in Midtown Manhattan and was carrying a backpack and deposit bag, which he was going to use to make a cash deposit for Whitner. Subsequently, law enforcement searched Freeman's apartment wherein they discovered and seized the Currency, pictured above, which was hidden in Freeman's closet and about which Whitner was aware but the Whitaker Group's in-house accountant was unaware.

43. After the seizure, law enforcement continued investigating the unlicensed MTB activity, resulting in the discovery of the process for moving money that is detailed above. From August 19, 2021 through April 26, 2022, law enforcement monitored unlicensed MTB activity by the aforementioned individuals and entities that consisted of the movement of no less than $1,550,000 in twelve $100,000 transactions, one $150,000 transaction, and one $200,000 transaction received from the Money Couriers and others, and delivered to Freeman, and ultimately Whitner.

44. On July 19, 2022, Whitner was captured on a consensually monitored phone call with Freeman. During the conversation, Freeman told Whitner that Freeman had been arrested by law enforcement, and that law enforcement had told him that the USC received from the Chinese nationals was proceeds of drug trafficking activity. During the conversation, Whitner told Freeman that he "had a feeling some fishy shit was going on[,]" referencing a prior conversation with YG that had taken place after a seizure of $50,000 in USC, pursuant to the arrest of one of the Money Couriers by law enforcement on May 31, 2022. Whitner explained that, due to the seizure, the Broker had agreed to repay the $50,000 to YG. Whitner proceeded to explain that any potential criminal source linked to the USC didn't have anything to do with his business selling shoes. Whitner further exclaimed that the Money Couriers "could be into Lord knows what[,]" but that his business was "exchanging shoes for money" and the business needed its revenue.

45. In the Fall of 2022, in the District of New Jersey, Freeman pled guilty to misprision of a felony for his role in the unlicensed MTB (DNJ Docket Number 2:23CR99-CCC). Also in the Fall of 2022, in the District of New Jersey, two of the Money Couriers—brothers Longzhi Zhuang and Longjun Zhuang—were charged via Criminal Complaint with an 18 U.S.C. § 1960 offense for their roles in the unlicensed MTB (DNJ Docket Number 2:22MJ12391-JBC).

46. Eventually, after DEA initiated an administrative forfeiture action against the Currency, Whitner claimed the Currency.

## VI. FIRST CLAIM FOR RELIEF – THE $1,199,530 IN CURRENCY (18 U.S.C § 981(a)(1))

42. The United States incorporates by reference the allegations set forth in the paragraphs above as if fully set forth herein.

43. The Currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because the Currency constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960 or one of the provisions of Title 31 noted herein, and/or property involved in one or more violations of or a conspiracy to violate 31 U.S.C. §§ 5324(b)(1) and/or 5324(a)(2).

## VII. CONCLUSION AND PRAYER FOR RELIEF

44. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as

required by 28 U.S.C. § 1921.

Respectfully submitted this 17th  day November, 2023.

                                  DENA J. KING
                                  UNITED STATES ATTORNEY

                                  **s/ Benjamin Bain-Creed**
                                  Florida Bar # 0021436
                                  Assistant United States Attorney
                                  Suite 1650, Carillon Building
                                  227 West Trade Street
                                  Charlotte, North Carolina 28202
                                  Telephone: (704) 344-6222
                                  Email: benjamin.bain-creed@usdoj.gov

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 17th day of November, 2023.

_____
Special Agent Rajender J. West
Internal Revenue Service,
Criminal Investigation